IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

TINA NATTELL,

                        Plaintiff,

            v.

CURRY COUNTY, et al,

                        Defendants.

Civ. No. 1:11-cv-03161-CL

REPORT & RECOMMENDATION

CLARKE, Magistrate Judge.

The Plaintiff brings claims against the defendants for violations of the Due Process

Clause of the Fourteenth Amendment, as well as for negligence, wrongful death, medical

malpractice, and vicarious liability. The court has jurisdiction through 42 U.S.C. § 1983 over the

constitutional claims and supplemental jurisdiction over the state law claims under 28 U.S.C. §

1367. This case comes before the court on motions for summary judgment filed by defendants

Curry County and Deputy Rod McAllister (collectively "County Defendants") (#38), Reginald

Williams (#43), and Arthur Shaw, Amanda Summers, Lisa Scherbarth, and Westlog, Inc. (collectively "Cal-Ore Defendants") (#47). For the reasons below, the motions should be GRANTED.

## BACKGROUND

On December 28, 2010, Wally Nattell called his mother Carol Rokos in Santa Maria California from his home in Brookings, Oregon. He told her he was calling to say "goodbye." He said that he had taken a bottle of pills. His words were slurring and unintelligible. His mother knew he had had a drinking problem in the past, but he "had never sounded like that before." When the line abruptly went dead, she tried calling his house, but did not get an answer. She then called Brookings Police dispatch and informed them of the conversation with her son. She asked them to help him and to call her back. 2nd Am. Compl. 6 (Doc. #23); Decl. Rokos 2-3 (Doc. #63).

Curry County Deputy Rod McAllister, along with two other deputies, responded to the dispatch reporting the call from Mrs. Rokos, which indicated a possible intentional drug overdose. When he arrived at the residence, McAllister observed Mr. Nattell outside walking toward his car with his keys in his hand. He had an odor of alcohol and was swaying while walking, such that McAllister did not want him to drive his car, although he appeared to be in control of his physical faculties, and was coherent. McAllister Decl. 3 (Doc. #39). When McAllister greeted Mr. Nattell, he told the deputy, "Oh, I was thinking about leaving, but I'm not now." McAllister said, "[It] wouldn't be a very good idea," and Mr. Nattell agreed. Vid. Tr. 2. [1]

---

[1] This citation refers to the transcript of the video recording of Deputy McAllister's response to Mr. Nattell's residence, 17615 Brown Deer Lane on December 28, 2010. Excerpts were submitted by the Cal-Ore defendants as Exhibit D to their Motion for Summary Judgment, which can be accessed through the court's ECF system (Doc. #50-4). The transcript is also in the record as Exhibit 1 to Declaration of Rod McAllister (Doc. #39-1) in support of the Curry County defendants' Motion for Summary Judgment (#38).

Deputy McAllister then followed Mr. Nattell into the residence, and into the back bedroom. McAllister Decl. 3 (Doc. #39). EMTs Scherbarth and Shaw arrived at the scene shortly thereafter. Vid. Tr. 8. Scherbarth said the scene was a little "chaotic" due to what she described as "the domestic situation in the house," which included yelling by Mrs. Nattell from another room of the residence. Scherbarth Depo. 35-40 (Doc. #68-2).

When McAllister asked Mr. Nattell what medications he took that night, "he indicated that he took his daily dose of valium, methadone, alprazolam, and possibly his blood pressure medication." McAllister Decl. 3. Mr. Nattell told McAllister that he drank two glasses of wine with his medication and that "this was his normal routine." Id. at 4; Vid. Tr. 11-12. After confirming that "this is all a normal event for you," EMT Scherbarth asked Mr. Nattell whether he would like to "go to the hospital and get checked out." He responded, "No, I don't." She replied, "Okay. I guess my issue is that if we don't take you to the hospital and you stay here, how's the rest of the evening going to go with your wife. . .?" Id. at 12. He responded by talking about locking his bedroom door, and Scherbarth replied, "Well, I just want to make sure that if we don't take you and you lay here, that you didn't take more than you're telling us and I come back later and you're not breathing." Id. at 13.

Scherbarth and McAllister then discussed some of the symptoms of Mr. Nattell's consumption of alcohol, methadone, and muscle relaxers; they agreed that "[t]he effects that we're seeing could be the methadone and the muscle relaxers working together." Id. at 14.

Scherbarth then went back to talking to Mr. Nattell: "And the story we got from dispatch is that you took a whole bunch of pills."

Mr. Nattell: "No. Four pills is enough. . . (inaudible)."

Scherbarth: "Okay, well I'm just concerned that – I don't want to leave here and something bad to happen to you."

Nattell: "Well, you know what? I think that would be great. Put me out of my misery." Id. When McAllister asked if that was really what he wanted to happen, Mr. Nattell continued, explaining that he "just want[ed] everything to go away" because he was sore. He also suggested that he did not want to "deal" with the other people in his house. Scherbarth then offered the idea that he go to the hospital with them, "just for the hell of it," but Mr. Nattell declined, saying, "All I'm trying to do is sit here and sleep."

Scherbarth: "But it might get you out of this situation for a night and let things calm down and maybe get you checked out."

Nattell: "It's going to calm down, because I'm going to lock that door again." Id. at 15.

Scherbarth asked Mr. Nattell if he knew the current year and location, and he answered correctly. A little later, she asked him, twice, if he thought it might help the situation if he just came with them to the hospital, but he again said no, both times. Scherbarth then conferred with Deputy McAllister, who said, "I can't place him on hold."

Scherbarth: "And we can't take him against his will, so. . ." Id. at 16.

Scherbarth then proceeded to tell Mr. Nattell that he would need to sign the paperwork releasing the EMTs of liability, saying at the same time, "But it doesn't stop us from coming back. I mean, but if you want us to come back later, if the pain's getting worse and your medication's not helping or you just need to get away from what's going on here tonight." Id. at 17. A few minutes later she asked him, "Are you able to sign? Because if you can't sign, then I'm going to take you with us. You're making me nervous." Id. at 22. EMT Shaw continued,

"This document right here says that you're refusing medical care and treatment, right down here on this line. Right there. Sign your name there."

Scherbarth then repeated her earlier statement that they could come back later to "just diffuse the moment" and give him a ride. "Don't take any more pills, though, tonight, please, because I think you've had enough." Id. at 23.

As the group of responders were leaving, Ms. Nattell, the plaintiff, protested, saying, "And what, he's going to come at me (inaudible) frickin' lying here? Don't leave him here, please."

Deputy McAllister: "Can't make him go. He'll be asleep in about two minutes."

Ms. Nattell: "I hope so. You don't know him. He don't give up."

At around 2:00 a.m. Ms. Nattell tried to enter the bedroom, but found the door locked. She pried it open with a butter knife in order to retrieve her pillow. The next day, Ms. Nattell heard occasional snoring throughout the day, but believed she should "let Wally sleep it off as Deputy McAllister directed [her] to." Decl. Nattell 11. Later that evening, she went in to see him, and he was unresponsive and not breathing; "he appeared to be dead." She began CPR and called 911. Id.

Around 6:00 p.m. on December 29, 2010, the EMTs, including Scherbarth, were called back to the scene to assist Mr. Nattell for an apparent drug overdose. Scherbarth Depo. 77, 81. A cardiac monitor showed that his heart was not beating. The EMTs administered CPR, an IV with saline, Atropine, and Epinephrine, intubation, and defibrillation, and loaded him into the ambulance to transport him to the hospital. Summers Rpt. 4 (Doc. #50-5). En route, Mr. Nattell's pulse returned, and CPR was discontinued. Id. at 3. Mr. Nattell was pronounced dead at the hospital.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. Id. at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. Devereaux, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

Plaintiff Tina Nattell, as personal representative of the decedent Wally Nattell, brings the following claims against the defendants. She alleges (1) violations of Mr. Nattell's Fourteenth Amendment Due Process rights, against all defendants; (2) negligence, against all defendants; (3) vicarious liability as to Cal-Ore for the actions of its employees defendants Scherbarth,

Summers, Shaw, and Williams; (4) vicarious liability as to Curry County for the actions of McAllister, as well as Scherbarth, Summers, and Shaw; (5) wrongful death, against all defendants; (6) medical malpractice, against defendant Williams.

Essentially, the plaintiff claims that the emergency responders, the EMTs and the deputy, ignored signs of extreme intoxication, overdose, and possible attempted suicide. She asserts that the defendants should have transported Mr. Nattell to the hospital and that their decision not to do so was negligent and violated Mr. Nattell's constitutional rights.

The defendants move for summary judgment as to all claims.

### 1) Plaintiff's Fourteenth Amendment claims fail as a matter of law

To prevail on a claim under §1983, a plaintiff must demonstrate: 1) the conduct complained of deprived him or her of an existing federal constitutional or statutory right; and 2) the conduct was committed by a state actor or a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); L.W. v. Grubbs, 974 F.2d 119, 120 (9th Cir. 1992), cert. denied, 508 U.S. 951 (1993). Plaintiff claims that the defendants violated the Fourteenth Amendment, which provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The plaintiff's §1983 claims fail against all defendants because Mr. Nattell's constitutional due process rights were not violated.

### a) No constitutional violation by County Defendants

Plaintiff claims that the Curry County Defendants violated Mr. Nattell's substantive due process rights based on the allegations that Deputy McAllister was deliberately indifferent to Mr. Nattell's serious medical need and "placed him in a zone of danger to which he succumbed." Plaintiff claims that McCallister decided, and influenced the EMTs to decide, to "leave Wally and his family bereft of any help, suggestions, or even questions that would have helped them

discover the true need Wally had." Plaintiff asserts that McAllister and the EMTs misinterpreted or ignored the extent of Mr. Nattell's intoxication and his potential for suicidal actions.  In essence, she argues that McAllister violated Mr. Nattell's constitutional rights by determining that he was not suicidal and did not need transport to the hospital.

"The concept of 'substantive due process' . . . forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir. 1998) (quoting United States v. Salerno, 481 U.S. 739, 746 (1987)).  "Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998).  By contrast, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id.  The Due Process Clause acts as a "limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." DeShaney v. Winnebago Cnty. Dept. of Soc. Servs., 489 U.S. 189, 195 (1989).

The general rule is that a state is not liable for its omissions. Patel v. Kent Sch. Dist., 648 F.3d 965, 971 (9th Cir. 2011).  However, a state's omission or failure to protect an individual may violate the Fourteenth Amendment if one of two exceptions applies: (1) the special relationship exception, or (2) the state-created danger exception. Id.; Campbell v. State of Washington Dep't of Soc. & Health Servs., 671 F.3d 837, 842 (9th Cir. 2011) cert. denied, 133 S. Ct. 275, (U.S. 2012) (citing DeShaney, 489 U.S. 189).  Because neither exception applies in this

case, the Curry County Defendants did not violate Wally Nattell's Fourteenth Amendment rights, and the plaintiff's claims under § 1983 fail as a matter of law.

The "special relationship exception" is created when "the State takes a person into its custody and holds him there against his will." Campbell, 671 F.3d at 842 (quoting DeShaney, 489 U.S. at 200). "In the special relationship situation, the state's affirmative duty to protect arises from the limitation the state has imposed on the person's freedom to act for himself; the duty does not arise 'from the State's knowledge of the individual's predicament or from [the State's] expressions of intent to help.'" Id. In fact, even state custody will not support a "special relationship" claim where a person is in custody voluntarily. See Campbell, 671 F.3d at 843.

In this case, the special relationship exception does not apply because Mr. Nattell was not in custody, and if he was, it was voluntary. When Deputy McAllister arrived on the scene, he suggested that it might not be a good idea for Mr. Nattell to get in his car and drive away. Mr. Nattell agreed and went back into his own house. McAllister followed him inside, but he did not restrain Mr. Nattell, or place him under arrest. Mr. Nattell was never deprived of any freedom to act for himself, thus none of the County Defendants ever had involuntary custody of him, and the special relationship exception does not apply.

The state-created danger exception applies only where two requirements are met: (1) affirmative conduct on the part of the state in placing the individual in danger, and (2) the state acts with deliberate indifference to a known or obvious danger. Patel, 648 F.3d at 974. First, "[i]n examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead, we examine whether the officers left the person in a situation that was more dangerous than the one in which they found him." Munger v.

City of Glasgow Police Dep't, 227 F.3d 1082, 1086 (9th Cir. 2000). Second, deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). The state actor must recognize an unreasonable risk and actually intend to expose the person to such risks without regard to the consequences to the person. Patel, 648 F.3d at 974.

For example, in Penilla v. City of Huntington Park, 115 F.3d 707, 708 (9th Cir.1997), decedent Penilla became seriously ill while sitting on his front porch. The first responders to a 911 call were two police officers. Id. The officers examined Penilla, found him to be in grave need of medical care, but then inexplicably canceled the request for paramedics. Id. They moved Penilla inside his house, locked the door, and left. Id. Penilla was found dead on his floor the next day, the result of respiratory failure. Id. Because the officers took affirmative actions that significantly increased the risk facing Penilla, knowing that he needed medical attention, the court held that the police acted with deliberate indifference and "clearly placed Penilla in a more dangerous situation than the one in which they found him." Id. at 710.

The case at bar is distinguishable from Penilla. Unlike the officers in Penilla, the defendants did not move Nattell to a more dangerous location. As discussed, when Deputy McAllister arrived, Nattell voluntarily walked into the house and into the back bedroom. McAllister followed him, but did not restrain Nattell, or deprive him of any freedom to act for himself. Unlike the officers in Penilla, the defendants did not prevent Nattell from receiving medical attention. Deputy McAllister spoke to Mr. Nattell with the EMTs for about 30 minutes in order to determine whether he was in need of transport to the hospital. They evaluated his mental state, his orientation to as to time and place, and whether he was attempting to commit suicide. Ultimately they determined he was not in need of further medical attention. Even if

this determination was an error, such a mistake would rise to the level of negligence, and not

deliberate indifference, as required by the exception. See Patel, 648 F.3d at 978 ("mere

negligence – or even gross negligence – is not enough for deliberate indifference").

Finally, unlike Penilla, none of the defendants made it less likely that Nattell would be

able to receive medical attention.  When Nattell refused transport, EMT Scherbarth told him

more than once that he could call them and they would come back at any time.  Additionally,

Mrs. Nattell stated that she went into his bedroom later that night to get a pillow, and heard him

snoring off and on up until about 15 minutes before she called 911 on the second night.  Indeed,

the fact that she realized Mr. Nattell had stopped breathing, called 911, and EMTs again

responded to the residence, shows that the defendants did not affirmatively act to increase the

risk to Mr. Nattell.

For the plaintiff's claim to survive summary judgment, she needs to raise a genuine issue

of material fact as to whether the defendants violated Mr. Nattell's substantive due process

rights.  While the plaintiff asserts that the defendants should have known that Mr. Nattell was

more intoxicated than he appeared to be, and that defendants should not have relied on Mr.

Nattell's own statements regarding his state of mind and drug consumption, she has not shown

how these actions, if true, rise above the level of negligence.  Because there are no facts to show

that they affirmatively acted to place Mr. Nattell in danger, or that they acted with deliberate

indifference to a known or obvious danger, the plaintiff's Fourteenth Amendment claims fail as a

matter of law.

### b) Curry County is not subject to § 1983 liability under Monell

Section 1983 liability of a local governing body arises only when "action pursuant to

official . . . policy of some nature caused a constitutional tort" and not on the basis of respondeat

superior. <u>Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691-99 (1978)</u>.
The "official policy" requirement was intended to "distinguish acts of the municipality from acts
of employees of the municipality, and thereby make clear that municipal liability is limited to
action for which the municipality is actually responsible." <u>Pembaur v. City of Cincinnati</u>, 475
U.S. 469, 479 (1986). The circumstances in which <u>Monell</u> liability may be found under § 1983
are "carefully circumscribed." <u>Fuller v. City of Oakland</u>, 47 F.3d 1522, 1534 (9th Cir.1995).

To impose liability against a county for its failure to act, a plaintiff must show: (1) that a
county employee violated the plaintiff's constitutional rights; (2) that the county has customs or
policies that amount to deliberate indifference; and (3) that these customs or policies were the
moving force behind the employee's violation of constitutional rights. <u>Gibson v. County of
Washoe</u>, 290 F.3d 1175, 1193-94 (9th Cir.2002), <u>cert. denied</u>, 537 U.S. 1106 (2003). "In limited
circumstances, a local government's decision not to train certain employees about their legal duty
to avoid violating citizens' rights may rise to the level of an official government policy for
purposes of § 1983." <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1359 (2011). However, a
municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on
a failure to train. <u>Id.</u>

As discussed above, Mr. Nattell's constitutional rights were not violated in this case;
Deputy McAllister and the other responders did not act with deliberate indifference, and the
plaintiff has not shown that there are policies in place that amount to deliberate indifference, let
alone that such policies were the moving force behind any violation of constitutional rights.
Therefore, there can be no <u>Monell</u> claim against Curry County.

### c) No constitutional violation by Cal-Ore Defendants

There are questions raised about whether or not defendant Cãl-Ore is subject to plaintiff's §1983 claims due to the requirement that the offending party act "under color of state law," or, in other words, whether there was any "state action," by the Cal-Ore defendants. However, because the Court has already determined that Mr. Nattell's constitutional rights were not violated, plaintiff's §1983 claims against Cal-Ore fail for the reasons discussed above.

### 2) State law claims

Plaintiff's state law claims are substantially related to her constitutional claims, and they arise from the same set of operative facts. Therefore the Court exercises supplemental subject matter jurisdiction under 28 U.S.C. § 1367 and applies Oregon law to these claims. United Mine Workers of America v. Gibbs, 388 U.S. 715, 726 (1966).

### a) Negligence claims against County Defendants fail

To state a claim for negligence under Oregon law, a plaintiff must allege a duty of care owed by the defendant, a breach of that duty, causation, and damages. Hilt v. Bernstein, 75 Or.App. 502, 510, 707 P.2d 88 (1985) (citing Brennan v. City of Eugene, 285 Or. 401, 591 P.2d 719 (1979)). If a plaintiff invokes a special status, relationship, or standard of conduct, then that relationship may create, define, or limit the defendant's duty to the plaintiff. Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP, 336 Or. 329, 340–41, 83 P.3d 322 (2004) (citing Fazzolari v. Portland School Dist. No. 1J, 303 Or. 1, 17 (1987); see also Donaca v. Curry Cnty., 303 Or. 30, 32, 734 P.2d 1339 (1987)). Absent such a special status, relationship, or standard, a defendant's liability for harm that his or her conduct causes is analyzed in terms of the concept of "reasonable foreseeability," id. at 340, or "general foreseeability," Slogowski v. Lyness, 324 Or. 436, 441, 927 P.2d 587 (1996).

### i.    Deputy McAllister is not liable for negligence

Plaintiff invokes a special relationship, alleging that Mr. Nattell was a "detainee" of Deputy McAllister, and that once detained, "Mr. Nattell had a right to timely and effective medical care for his serious medical need and a special relationship as envisioned by <u>Fazzolari</u>." Presumably[2] this claim is based on the relationship specified by the Restatement (Second) of Torts section 314A(4): "One who. . . takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection" is under a duty "(a) to protect them against unreasonable risk of physical harm, and (b) to give them first aid after [he] knows or has reason to know they are ill or injured, and to care for them until they can be cared for by others." As discussed above, Mr. Nattell was not in custody; therefore, this special duty does not apply. Moreover, even if the duty did apply, it was discharged by the simple undisputed fact that EMTs arrived on scene, took Mr. Nattell's vital statistics, and evaluated his medical condition.

Plaintiff claims that even if there is no special relationship, there are questions of fact in dispute regarding McAllister's negligence. These include "whether McAllister exceeded his authority as a former paramedic in giving bad medical opinions to [EMT] Scherbarth," whether "he failed to seek online medical control help when faced with Mr. Nattell's conflicting statements," whether he "used his personal bias against Mr. Nattell to give him short shrift and ignore the overdose and suicide warning signs," whether he "used his position to put down plaintiff's requests that her husband be taken," and whether he "used poor decision making skills in taking Mr. Nattell's word that he only took his usual medicine dose in view of obvious contradictions facing him."

---

[2] Plaintiff does not cite to a particular page or portion of <u>Fazzolari</u>. However, that case deals with the "special duty arising from the relationship between educators and children entrusted to their care," and is based on the compulsory school attendance law. 303 Or. at 19. As that specific special relationship is inapplicable to the case at bar, the Court assumes that the Plaintiff's reference is to the legal principle of a special relationship in general.

To support these claims, Plaintiff cites to various Oregon Administrative Rules, which list conduct that is considered to be contrary to the recognized standards of ethics of the medical profession. Plaintiff also cites to a Fact Statement that lists over 50 "disputed and undisputed facts." Finally, Plaintiff points to O.R.S. § 426.228 to demonstrate that Deputy McAllister was not properly trained to determine whether Mr. Nattell needed transport to the hospital.[3] O.R.S § 426.228 allows an officer to take a person into custody pursuant to a "peace officer hold" when "the officer has probable cause to believe [he] is dangerous to self or to any other person and is in need of immediate care, custody, or treatment for mental illness." O.R.S. § 426.228(1).[4] Confusingly, the Plaintiff claims both that the County should have had a medical policy in place for McAllister to follow to "determine if an overdose subject is a danger to himself or others," and also that McAllister "improperly inserted himself into the medical evaluation process and thereby tainted the EMT's evaluation." It is unclear whether Plaintiff believes that McAllister should or should not have evaluated Mr. Nattell's medical and mental state more or less than he actually did at the time.

Ultimately, none of the allegations support a genuine issue of material fact as to whether Deputy McAllister can be held liable for negligence. The undisputed video recording and transcript shows only that Deputy McAllister discussed Mr. Nattell's symptoms with Scherbarth, Scherbarth continued asking Mr. Nattell questions about his drug and alcohol ingestion and his state of mind, and McAllister concluded, "I can't place a hold on him." The peace officer hold statute gives an officer the authority to take a person into custody, but it does not create a duty to

---

[3] The statute is cited in the section of Plaintiff's brief pertaining to the County's liability for negligent training, but it is useful here in determining an officer's duty in such a situation.

[4] The term "probable cause" is not defined in O.R.S. § 426, but Oregon courts have held that, by analogy to O.R.S. § 131.005, it may be defined as a substantial objective basis for believing that more likely than not a person is mentally ill. State v. Smith, 71 Or. App. 205, 211, 692 P.2d 120, 124 (1984). "The determination of probable cause is a legal, not a factual, conclusion. Probable cause does not require certainty." State v. Herbert, 302 Or. 237, 241, 729 P.2d 547 (1986).

do so. O.R.S. § 426.228(1). To hold otherwise would mean requiring an officer to potentially

violate a person's Fourth Amendment rights against unreasonable search and seizure in order to

protect the officer him or herself from a potential negligence suit. The court cannot agree with

such an untenable position. The County Defendants have shown that McAllister reasonably

determined that he did not have probable cause to take Mr. Nattell into custody. Without

probable cause, McAllister not only had no duty to take Mr. Nattell into custody, but also no

legal right to do so.

### ii.    Curry County is not liable for negligence

Plaintiff claims that the County negligently educated, trained, and supervised Deputy

McAllister. The allegations revolve around the assertion that McAllister "improperly inserted

himself into the medical evaluation process," as well as the claim that the County sent McAllister

on overdose calls "without any medical policy to determine if an overdose subject is a danger to

himself or others per O.R.S. § 426.228." Plaintiff also claims that McAllister "[a]s a former

paramedic, should have known that providing a medical opinion was beyond the scope of his

work as a first responder."

First, Plaintiff fails to show that McAllister provided a medical opinion. The record

shows that he told the EMTs when they arrived that Mr. Nattell was "not suicidal," and later he

told EMT Scherbarth, "I can't place a hold on him." He also discussed Mr. Nattell's symptoms

of drug and alcohol consumption with the EMTs. All of these evaluations were within the scope

of his position, which was to determine if probable cause existed to place Mr. Nattell in custody

under a peace officer hold, as discussed above. Second, Plaintiff fails to show how McAllister

would have been negligent, even if he had given his medical opinion. Third, Plaintiff fails to

show how the County negligently trained McAllister in such a way that it was a substantial cause

of the ultimate outcome. Additionally, the Plaintiff cannot argue both that McAllister was improperly trained and that he should have known better than to give his opinion, based on his training and experience. As discussed, Deputy McAllister did not act unreasonably, and Plaintiff fails to create an issue of material fact as to whether he was negligently trained, educated, and supervised by the County.

### iii.    Curry County is not vicariously liable for the claims against the EMTs

Plaintiff claims that the County is vicariously liable for the allegedly negligent actions of EMTs Scherbarth and Shaw (Cal-Ore employees). Whether plaintiff's negligence claims against the EMTs can survive summary judgment is discussed below, however, even if they can, the County cannot be held vicariously liable.

The Oregon Tort Claims Act (OTCA) provides for the scope of liability of a public body under state law. O.R.S. § 30.256. It states that "every public body is subject to civil action for its torts and those of its officers, employees, and agents acting within the scope of their employment or duties." O.R.S. § 30.256(1). Oregon courts apply the "right to control test" to determine whether a person is an employee or an agent of a public body. Schaff v. Ray's Land & Sea Food, Inc., 334 Or. 94, 45 P.3d 936 (2002); Cain v. Rijken, 300 Or. 706, 717 P.2d 140 (1986). Whether a person is an employee or an independent contractor is a question of law. Schaff, 334 Or. at 103, 45 P.3d 936. This legal conclusion depends on the facts of the case that relate to the extent to which the purported employer has the right to control the manner and performance of the work or services by the individual. Id. at 99–101, 103, 45 P.3d 936. The right to control test is not based on the actual exercise of control, but on the right to control the manner and means of accomplishing the result. Cantua v. Creager, 169 Or.App. 81, 92, 7 P.3d 693 (2000). Four factors are relevant in determining whether a purported employer has the right

to control an individual: 1) direct evidence of the right to control an individual; 2) the method of payment; 3) furnishing of equipment; and 4) the right to discharge. Id.  Between control and the payment of wages, control is the decisive factor for determining employment. Matter of Compensation of Hunter, 54 Or.App. 718, 722, 635 P.2d 1371 (1981).

Additionally, a principal is vicariously liable for an act of its nonemployee agent only if the principal "intended" or "authorized the result [ ]or the manner of performance" of that act. Vaughn v. First Transit, Inc., 346 Or. 128, 137, 206 P.3d 181, 187 (2009) (quoting Restatement, (Second) of Agency at § 250).  It is "only when the principal's control over the agent with respect to the actions of the agent that gave rise to the tort claim is similar to the control that an employer exercises over an employee will the principal be vicariously liable for the negligence of its nonemployee agent." Id. at 139.

The plaintiff has presented no evidence that Curry County had the right to control EMTs Scherbarth and Shaw, their method of payment, the furnishing of their equipment, or the right to discharge them.  While plaintiff claims that the conduct of the EMTs constituted "state action," that theory is relevant only in the context of constitutional violation. See Jensen v. Lane Cnty., 222 F.3d 570, 574 (9th Cir. 2000) (finding that the conduct of a private citizen constituted state action under § 1983 only after establishing that the plaintiff had suffered a deprivation of constitutional rights).  Under the OTCA, the County is responsible only for the torts of its own employees or agents, and there is no evidence that the EMTs were employees or agents of the County; therefore the County is not vicariously liable for any state law claims against the EMTs.

### b) State law claims against Cal-Ore defendants fail for lack of causation

The Cal-Ore defendants claim that summary judgment is appropriate for two main reasons: 1) Mr. Nattell refused treatment, and 2) lack of causation between the defendants'

actions on December 28 and Mr. Nattell's death on December 29.  The Court agrees that the

plaintiff has not raised a genuine issue of material fact as to whether or not the defendants'

conduct was the actual and legal cause of Mr. Nattell's death.  Therefore the plaintiffs' state law

claims fail as a matter of law.

  For legal causation to exist under general principles of negligence, the act of the

defendant must at least be a "substantial factor" in bringing about the injury to plaintiff.  Brennen

v. City of Eugene, 285 Or. 401, 413, 591 P.2d 719, 726 (1979).  Under Oregon law, "when the

element of causation involves a complex medical question, a plaintiff must present expert

testimony that there is a reasonable medical probability of causation."  Phelps v. Wyeth, Inc.,

6:09-CV-06168 TC, 2013 WL 1403060 (D. Or. Apr. 2, 2013) (citing Chouinard v. Health

Ventures, 179 Or.App. 507, 512, 39 P.3d 951 (2002)).  "Proof of cause-in-fact must have the

quality of reasonable probability, and a mere possibility that the alleged negligence of the

defendant was the . . . cause of plaintiff's injuries is not sufficient." Joshi v. Providence Health

Sys. of Or. Corp., 198 Or.App. 535, 545, 108 P.3d 1195 (2005).

  In this case, it is undisputed that Mr. Nattell died on the evening of December 29 and that

his death was caused by an overdose of methadone.  Defendants have offered the expert opinion

of Brent T. Burton, M.D., a toxicologist, to show that, based on blood concentration, Mr.

Nattell's died because he ingested at least 100mg of methadone within four hours of his death.

Decl. Burton (Doc. #49).  Plaintiff argues that she has created a question of fact on this issue

because her expert, Joseph Barger, M.D., testified that in his opinion it was "a reasonable

estimate" that ingestion happened before the responders left the scene on the 28th.  However he

also testified that "it's really hard to know."  Barger Depo. (Doc.# 102-1).  Additionally, on cross

examination, Dr. Barger stated that his role as an expert was to testify regarding the standards of

care for the EMTs, and he stated that he does not have a toxicology background to go beyond his

opinion of their performance that night. Barger Depo. (Doc.# 104-1).

As to state law claims, federal courts apply state substantive law, and federal procedural

law. See, e.g., Hanna v. Plumer, 380 U.S. 460, 465 (1965). The Federal Rules of Evidence

require that an expert's opinion be based on "the expert's scientific, technical, or other

specialized knowledge." Fed. R. Evid. 702(a). Dr. Barger stated he did not have that knowledge.

Accordingly, Dr. Barger's opinion on the subject of the timing of ingestion is inadmissible under

FRE 702; thus it is insufficient to contradict the opinion of defendants' toxicologist Dr. Burton.

Finally, Plaintiff's counsel argues that he has retained a qualified expert, William Brady,

M.D., a toxicologist, who is "available and willing to testify to admissible facts and opinions

creating a question of fact sufficient to controvert the allegations of the defense motions for

summary judgment and which would provide an adequate basis for the court to deny the

motion." This argument is unpersuasive.

Under the Federal Rules of Civil Procedure, a party asserting that a fact is genuinely

disputed must support the assertion by:

> **(A)** citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information,
> affidavits or declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory answers,
> or other materials; or
> **(B)** showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). In addition, "if a party fails to provide information or identify a witness

as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to

supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless." Fed. R. Civ. P.37(c)(1).

Dr. Brady's opinion does not exist as admissible evidence in the record before the Court. Counsel's assurance that Brady will testify to create a question of fact, (it is unclear exactly how he would do so), is insufficient.  Even if counsel submitted a substantive report from Dr. Brady creating a genuine issue of fact on causation, at this stage of the proceeding it would be neither substantially justified, nor harmless under FRCP 37(c)(1), as defendants did not have notice of such a report, and chose not to depose Dr. Brady for that reason.  See Bixby v. KBR, Inc., 282 F.R.D. 521, 530 (D. Or. 2011) (holding that untimeliness, lack of new fact discovery, and lack of notice to defendants weigh in favor of imposing Rule 37 sanctions for a late-filed expert report on causation).

## CONCLUSION

The fact that Mr. Nattell's death was caused by methadone he ingested almost a day after the defendants' left the scene is undisputed by the evidence in the record.  Thus, the plaintiff has failed to show a causal link between the defendants' actions and Mr. Nattell's death.  The plaintiff's claims of negligence, wrongful death, medical malpractice, and vicarious liability fail as a matter of law.  Plaintiff's constitutional claims also fail as a matter of law because there is no genuine issue of material fact as to whether the defendants acted with deliberate indifference such that Mr. Nattell's substantive due process rights were violated.

## RECOMMENDATION

For the reasons stated above, defendants' motions should be GRANTED, and judgment awarded for the defendants as to all claims.

***This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.***  Any notice of appeal pursuant to Federal Rule of Appellate Procedure Rule 4(a)(1) should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. ***Objections to this Report and Recommendation, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen(14) days after the date the objections are filed.*** *See* FED. R. CIV. P. 72, 6.  Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED this _____28_____ day of August, 2013.


_____
MARK D. CLARKE
United States Magistrate Judge